# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| KARI L. LANDUYT, | |
| Plaintiff, | No. 17-CV-0019-LTS |
| vs. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION |
| Defendant. | |

## I. INTRODUCTION

This case is before me on a Report and Recommendation (R&R) by the Honorable Kelly K.E. Mahoney, United States Magistrate Judge. *See* Doc. No. 16. Judge Mahoney recommends that I affirm the decision of the Commissioner of Social Security (the Commissioner) denying plaintiff Kari L. Landuyt's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq.

Landuyt filed timely objections (Doc. No. 17) to the R&R. The procedural history and relevant facts are set forth in the R&R and are repeated herein only to the extent necessary.

## II. APPLICABLE STANDARDS

### A. *Judicial Review of the Commissioner's Decision*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind

might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

To determine whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but [it does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court "must search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

To evaluate the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.,* 879 F.2d 441, 444 (8th Cir. 1989). The court, however, "do[es] not reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court "find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true "even if [the court] might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely

because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see also Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

### B. *Review of Report and Recommendation*

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude

3

further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### III.    THE R&R

Landuyt alleged disability based on osteoarthritis in her lower back, numbness and tingling in her feet and hands, tight hip and thigh muscles, grinding and clicking in her knees, fatigue, heart arrhythmia, and balance issues.  AR 84-85.  The record also demonstrates diagnoses of myofascial pain syndrome and, later, fibromyalgia.  In support of her claim, Landuyt submitted two[1] residual functional capacity (RFC) opinions by her treating physician, Dr. Clete Younger.  AR 714, 778.  Although Dr. Younger opined that Landuyt had disabling symptoms as a result of her fibromyalgia, the ALJ gave "little overall weight" to this opinion and determined that Landuyt retained the RFC to do past work.  At issue is whether the ALJ erred in (1) failing to find Landuyt's fibromyalgia was a severe impairment; (2) attributing little weight to Dr. Younger's opinions; and (3) failing to order a consultative examination.  *See* Doc. 13.

Judge Mahoney first considered whether substantial evidence supported the ALJ's finding that Landuyt's fibromyalgia was not a severe impairment:

> Landuyt argues the ALJ improperly found that although "[f]ibromyalgia was noted later in the treatment records," no "formal fibromyalgia tender point testing was administered, per the requirements of SSR 12-2p."  AR 17.  Landuyt points to evidence (Doc. 13 at 6) that Dr. Younger administered such testing in March 2016 (after the ALJ issued her written opinion) and found all 14 tender points positive bilaterally (AR 774), as well as other treatment notes that discuss Landuyt's "tender points" without listing the location and number of tender points (AR 725-26, 731-32, 737, 740, 755, 762 (noting "multiple tender points in neck and back"

---

[1] The first RFC opinion was authored July 23, 2015, (AR 714) and was considered by the ALJ in writing the opinion.  The second RFC opinion was authored May 4, 2016, (AR 778) and was not available to the ALJ at the time the opinion was written.  However, it was submitted to the Appeals Council along with additional supporting medical records.

and "[n]o focal tenderness and no focal bone tenderness" in September and October 2014, before Landuyt was diagnosed with fibromyalgia; "multiple tender points in both sides" and "[s]table diffuse tender points of the upper back and low back" in July 2015, after Landuyt was diagnosed with fibromyalgia; "stable tender points of chronic intermittent and variable joint pains" in August 2015; and "[d]iffuse tender points particularly in her back unchanged from the last visit" in October 2015)). Landuyt argues the ALJ's error was material because if the ALJ had found fibromyalgia to be a severe impairment, she would have credited Dr. Younger's opinions. Doc. 13 at 6-7.

Here, the record shows the ALJ was aware that Landuyt had recently been diagnosed with fibromyalgia at the time of the hearing. AR 39, 55, 82 (noting her fibromyalgia diagnosis). The ALJ found that Landuyt had the severe impairment of myofascial pain syndrome, but not fibromyalgia. AR 14. Myofascial pain syndrome is a "disorder[] that may have symptoms or signs that are the same or similar to those resulting from [fibromyalgia]." SSR 12-2p, 77 Fed. Reg. at 43642 n.7. Substantial evidence in the record (including Dr. Younger's own treatment notes) supports that Landuyt suffered from myofascial pain syndrome, which involves similar symptoms as fibromyalgia. *See* AR 451-60 (prior provider diagnosing osteoarthritis, back pain, and arthritis that were improved with medication and physical therapy), 505-12 (Dr. Younger's records diagnosing chronic low back pain with no significant functional limitations and controlled by medication), 736-45 (Dr. Younger's records diagnosing myofascial pain syndrome). In support of her argument that the ALJ erred by failing to include fibromyalgia as a severe impairment, Landuyt cites Dr. Younger's March 2016 treatment notes and medical source statement (AR 774-85), which document he found that Landuyt had 14 positive tender points and that she met the criteria for a fibromyalgia diagnosis. Doc. 13 at 6. These records were submitted after the ALJ's written decision in December 2015 and were therefore not part of the record the ALJ considered (the Appeals Council admitted this evidence into the record but found it "does not provide a basis for changing the [ALJ's] decision"). AR 2, 5. Other records from Dr. Younger (from July to November 2015), issued after the administrative hearing but before the ALJ's written opinion, include a diagnosis of fibromyalgia. AR 724-32, 754-68. Although these records note "multiple tender points," they do not indicate the number and location of tender points, which does not seem sufficient to meet the requirements of tender-point testing under SSR 12-2p (as the ALJ found). *See* 77 Fed. Reg. at 43641 n.6 (noting that the ALJ may use the six-signs-or-symptoms criteria "to determine [a medically determinable impairment] of [fibromyalgia] if

5

the case record does not include a report of the results of tender-point testing[] or the report does not describe the number and location on the body of the positive tender points"). . . .

Nevertheless, even if the ALJ erred in finding that Landuyt suffered from myofascial pain syndrome but not fibromyalgia, any error is harmless. Regardless of which impairments are determined to be severe at step two, in determining a claimant's RFC "[a]t step four[,] the ALJ considers both severe and non-severe impairments[, and t]herefore, the real issue is whether the ALJ properly determined [the claimant]'s RFC at step four of the sequential process." *Sumners v. Astrue*, No. 09-5065-CV-S-RED-SSA, 2010 WL 2955367, at *2 (W.D. Mo. July 23, 2010) (citation omitted). In this case, the ALJ did not find Landuyt was not disabled at step two, because the ALJ did find she had severe impairments (including myofascial pain syndrome). AR 14-15. The ALJ also considered the symptoms for myofascial pain syndrome (which appear to be the same or very similar symptoms that caused Dr. Younger to diagnose fibromyalgia) and their effects on Landuyt in determining her RFC. AR 16-20. Thus, the ALJ did not err in failing to find Landuyt had a severe impairment of fibromyalgia.

Doc. No. 16 at 5-9.

Turning to the related question of whether the ALJ erred in weighing Dr. Younger's RFC opinions, Judge Mahoney found that the ALJ offered good reasons for giving the opinions little weight:

Dr. Younger treated Landuyt from July 24, 2013, through March 2016; he saw her four times from July to November 2013 (once in July, twice in September, and once in November), three times in 2014 (in March, September, and October), five times in 2015 related to pain (twice in July 2015, and once in August, October, and November 2015), and twice in 2016 (in February and March). AR 505-12, 714-19, 724-32, 737-45, 754-85. In July 2013, Dr. Younger completed a medical source statement in which he found that Landuyt could sit for more than two hours at a time for a total of at least six hours in an eight-hour workday; that she could stand or walk for fifteen minutes at a time for a total of less than two hours; that she would need to walk around every thirty minutes and take unscheduled breaks at least hourly; and that she would need to shift at will between standing, sitting, and walking. AR 715-17. He also found that she could occasionally lift ten pounds and rarely lift twenty pounds, that her symptoms would interfere with her attention and concentration more than twenty-five percent of the time, and that she would miss work more than

6

four days a month. AR 717-18. In his March 2016 statement, he found she could only sit for fifteen minutes before needing to stand, but she could stand or walk for thirty minutes before needing to sit, and he further opined that she could sit and stand each for a total of less than two hours in an eight-hour workday. AR 782. He found that she would need to walk around every fifteen minutes and that she could rarely lift weight under twenty pounds (and could never lift more than that). AR 783. He opined for the first time that she would have limitations in her hand and arm movements, and he again found that her concentration would be interrupted more than twenty-five percent of the time and that she would miss more than four days of work each month. AR 783-84. [Dr. Younger's July 2013 statement is internally inconsistent (Landuyt can sit for more than two hours at a time but must walk every thirty minutes and shift between sitting and standing at will), and his July 2013 and March 2016 statements are inconsistent with each other (she can stand fifteen versus thirty minutes; she can sit fifteen minutes versus more than two hours). This further supports the ALJ's decision to assign Dr. Younger's opinions little weight.]

Landuyt argues that the medical evidence supports Dr. Younger's opinions and that therefore the ALJ should have given them controlling weight. Doc. 13 at 10-12. In particular, Landuyt cites to portions of the record showing tender points on examination (AR 725-26, 731-32, 737, 740, 755, 762). Doc. 13 at 11. Landuyt also argues that Dr. Younger noted in his March 2016 statement that Landuyt had additional symptoms of fibromyalgia (including fatigue, depression, cognitive dysfunction, anxiety, waking unrefreshed, muscle pain or weakness, numbness or tingling, abdominal pain and cramps, nervousness, chest pain, blurred vision, and dry mouth) that are well-supported by the record. Doc. 13 at 11-12. There is support in Dr. Younger's records that Landuyt experienced additional symptoms, including numbness (AR 507), heartburn (AR 509), depression (AR 725, 755), dry mouth and tiredness (AR 737), nausea (AR 755), and sleep disturbance (AR 737, 766). Some of Landuyt's symptoms, however, were attributable to medication side effects. AR 509 (heartburn), 737 (dry mouth and mild sedation), 755(nausea). Other portions of the record show a lack of symptoms. *See* AR 511, 740 (no nausea, vomiting, stomach issues, or shortness of breath), 727 ("doing OK"), 730 (no acute depression or anxiety), 744 (no sleep disruptions and good mood overall).

The ALJ found that Dr. Younger's opinions were inconsistent with his treatment records, including findings from physical examinations. The ALJ noted that Landuyt demonstrated only subjective tenderness and pain (AR 18), but this is not necessarily inconsistent with fibromyalgia. *See*

7

*Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005) (holding that "the ALJ misunderstood fibromyalgia" when "the ALJ . . . stated that [the claimant's] symptoms of muscle aches and pains had not been substantiated by objective medical testing"). Accordingly, I do not believe this was a good reason, standing alone, to not fully credit Dr. Younger's opinions. Dr. Younger's treatment notes, however, do contain inconsistencies, including with the extreme limitations contained in his medical source statements. Interestingly, a record from an October 2015 visit notes that Landuyt has been diagnosed with fibromyalgia since September 19, 2014 (AR 754), which is consistent with the date listed on Dr. Younger's March 2016 treating source statement (AR 778). His record from the visit on September 19, 2014, however, includes a diagnosis of myofascial pain syndrome, not fibromyalgia. AR 739-41; *see also* AR 737-38 (October 2014 treatment record). There is no mention of fibromyalgia in the treatment records until July 2015 (AR 730-32) (after the administrative hearing in June 2015, at which the ALJ asked Landuyt if her doctor had performed any "tender point tests" (AR 82)).

The treatment notes also show that aside from pain and some limited range of motion, the remaining portions of the physical examinations (motor strength, tone, sensation, reflexes, and gait) were generally normal. AR 506, 511, 726, 732, 737, 740, 743, 745, 747, 755, 763, 767. Although a record from February 2016 contains a report from Landuyt that she "still experienced his [sic] daily pain which is very limiting," there is no indication what these limitations were. AR 772. Dr. Younger's records also lack indications that Landuyt was specifically limited in her ability to function and in fact, show that her pain did not significantly affect her functional abilities. *See* AR 511 ("fairly functional at her current level of pain" in July 2013), 743 ("no exertional symptoms" in March 2014). Other treatment records contain similar information. AR 453 (Landuyt reported in August 2012 that although she quit her job due to scheduling issues and doctor's appointments, she was "pretty active at home . . . [and] does all the house chores without any issues"). Inconsistencies with treatment notes provide a good reason to not give a treating physician's opinion controlling weight. *See Hamilton v. Astrue*, 518 F.3d 607, 610-11 (8th Cir. 2008); *Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007) (records showing tender points but also normal examinations in other areas, such as range of motion, and recommendations of exercise and a nonsteroidal drug demonstrated inconsistencies). The treatment records therefore support the ALJ's finding that Dr. Younger's opinions of Landuyt's ability to stand, walk, and lift were not supported by the physical findings.

Multiple records also support the ALJ's finding that Dr. Younger's opinions were inconsistent with the moderate relief that Landuyt's medications provided. AR 506 (noting that Landuyt's pain was under better control and continuing medications and referring for physical therapy); 507 (medication helping); 724 ("moderate improvement" with medications); 737 (medication provided "faster recovery of pain after activity"); 755 (pain improved 60% with medication); 766-67 (medication was working well, pain was better controlled, and Landuyt was not having to take daily nonsteroidal anti-inflammatory drugs); 771 (noting Landuyt had "improved with [current medications] but still ha[d] residual symptoms," and Landuyt was advised that the goal was to improve pain and that Dr. Younger "may not be able to eliminate pain altogether"). In particular, Dr. Younger noted on March 4, 2016 (the same day as his second opinion statement) that Landuyt had "good control [of her symptoms] with [her] current medications" and that these medications "have helped her symptoms." AR 774. Treatment records from previous providers also show Landuyt's symptoms responded well to medication and physical therapy. AR 338, 451, 453, 457-58, 535, 595, 598, 650, 710, 712. A claimant's condition that is "controllable and amenable to treatment [] 'do[es] not support a finding of disability.'" [*Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011)] (quoting *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009)). The record therefore supports the ALJ's conclusion that Dr. Younger "somewhat overstated" Landuyt's need to take unscheduled breaks, alternate positions, miss work, and ability to stay on task (AR 18).

The ALJ also noted inconsistency between Dr. Younger's opinions and Landuyt's reported activity level. Substantial evidence supports this finding. Landuyt reported the ability to perform various daily activities, including cooking, performing household chores (such as doing dishes, dusting, laundry, and making her bed), gardening, playing games on her phone, chatting with friends on Facebook, and crocheting. AR 64-69, 229, 231. She generally goes outside daily, attends church weekly (including fellowship after services for around an hour and a half), can drive (up to an hour), and shop in stores for 15 minutes to two hours at a time. AR 42, 71-73, 230. She also testified she can sit for around an hour to an hour and a half before needing to readjust positions or walk around for a little bit, and she stated that she did not need to take extra breaks at her prior job (as a bank teller). AR 45-46, 53. These reports further undermine Dr. Younger's opinions.

The ALJ also found that the subjective symptoms and limitations reported by Landuyt were not consistent with the record (Landuyt does not

9

> challenge this finding). AR 19-20. Dr. Younger's records discuss Landuyt's subjective reports of limitations (AR 772), and it appears, based on his records lacking documentation of the specific type and extent of any limitations, that he based his opinions of Landuyt's functional abilities, at least in part, on her subjective complaints. An ALJ may discount a treating source's opinion to the extent it is based on the claimant's subjective complaints that were not fully credited. *Vance v. Berryhill*, 860 F.3d 1114, 1121 (8th Cir. 2017) ("Because the ALJ reasonably concluded that [claimant's] statements lacked credibility, [the ALJ] could discount [the treating source's] opinion to the extent that it relied on [claimant's] subjective complaints."). The ALJ therefore provided good reasons for the weight given to Dr. Younger's opinions.
>
> Landuyt argues the ALJ erred by not adopting all of the functional limitations contained in Dr. Younger's treating source statements. Doc. 13 at 8-10. The ALJ clearly considered Landuyt's symptoms and the specific limitations contained in Dr. Younger's opinions. *See* AR 18. I find, however, that the ALJ provided good reasons for the weight assigned to Dr. Younger's opinions. Therefore, the ALJ was not required to adopt the limitations contained in Dr. Younger's statements.

Doc. No. 16 at 10-15.

Finally, Judge Mahoney addressed whether the ALJ erred by failing to order a consultative examination to confirm Dr. Younger's diagnosis of fibromyalgia:

> The regulations provide that the Social Security Administration "may purchase a consultative examination to try to resolve an inconsistency in the evidence[] or when the evidence as a whole is insufficient to . . . make a determination or decision on [the] claim." 20 C.F.R. § 404.1519a(b); *see also* SSR 12-2p, 77 Fed. Reg. at 43643. "It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for [the ALJ] to make an informed decision." *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985) (per curiam) (quoting *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984)). A consultative examination will not be purchased, however, "solely to determine if a person has [fibromyalgia] in addition to another [medically determinable impairment] that could account for [the claimant's] symptoms." SSR 12-2p, 77 Fed. Reg. at 43643.
>
> Here, there were no inconsistencies in the evidence requiring a consultative examination, and the evidence was sufficient for the ALJ to assess Landuyt's RFC and determine whether she could perform past

relevant work. The ALJ found that Landuyt's disorders of the back and myofascial pain syndrome were severe impairments that significantly affected her ability to work. AR 14. In considering what impact these impairments had on Landuyt's RFC, the ALJ reviewed the medical records and evidence (in addition to other information contained in the record). AR 15-20. The ALJ was able to determine Landuyt's RFC based on this information. I believe the RFC determination is supported by substantial evidence (and Landuyt does not argue otherwise). The ALJ therefore had sufficient evidence and did not err by failing to order a consultative examination. *See Martise*, 641 F.3d at 926-27 (rejecting argument that the ALJ should have ordered a consultative examination when the ALJ considered the medical evidence and made factual findings about the evidence that were supported by substantial evidence). Regardless of the ALJ's finding regarding fibromyalgia, the ALJ fully considered Landuyt's various symptoms that were consistent with fibromyalgia in determining Landuyt's RFC. AR 17-20.

Doc. No. 16 at 15-16. In conclusion, Judge Mahoney recommends affirming the ALJ's decision. *Id.* at 16.

## IV. DISCUSSION

Landuyt objects to Judge Mahoney's conclusions that (1) the ALJ properly evaluated Dr. Younger's RFC opinion and (2) the ALJ did not err in failing to order a consultative examination. I will review these issues de novo.

### A. *Dr. Younger's Opinions*

Landuyt argues that the ALJ erred in concluding that she did not have fibromyalgia and that the ALJ improperly evaluated Dr. Younger's RFC opinion as a result. The ALJ's RFC is less restricting than Dr. Younger's RFC. Specifically, the ALJ found that Landuyt had the RFC to perform light work:

> [Landuyt] can lift and carry 20 pounds occasionally and 10 pounds frequently. She could stand and walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday. Her ability to push and pull, including the operation of hand and foot controls, would be unlimited within those weights. She is right-hand dominant. She could

11

occasionally climb ramps and stairs, as well as occasionally balance, stoop, kneel, and crouch. She could never climb ladders, ropes, or scaffolds, and never crawl. She would need to avoid concentrated exposure to extreme cold, fumes, odors, gasses, poor ventilation, dust, and wetness.

AR 15. This RFC does not include Dr. Younger's standing and walking limitations from July 23, 2015 (Landuyt can stand or walk for less than two hours in an eight-hour workday but sit for more than 6 hours), or Dr. Younger's standing, walking and sitting limitations from March 9, 2016 (Landuyt can sit or stand for less than two hours in an eight-hour workday). AR 716, 782. The ALJ's RFC also does not adopt Dr. Younger's opinion that Landuyt will need to make frequent shifts between sitting, standing and walking to manage her pain. AR 716 (Landuyt will need to shift positions at will, with a walk break every 30 minutes lasting 5 minutes), 782 (Landuyt will need to shift position at will, with a walk break every 15 minutes lasting 15 minutes). Dr. Younger attributed his limitations to the pain caused by Landuyt's fibromyalgia. Adopting Dr. Younger's RFC opinion would result in a finding that Landuyt is disabled. AR 81.

An opinion by a treating physician must be given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ must give "good reasons . . . for the weight [the ALJ gives a] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2); *see also Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). By contrast, a consulting expert's opinion is generally entitled to less weight and will normally not constitute substantial evidence, particularly where the opinion is inconsistent with the record as a whole. *Cantrell v. Apfel,* 231 F.3d 1104, 1107 (8th Cir.2000); *Cowles v. Colvin*, 102 F. Supp. 3d 1042, 1055 (N.D. Iowa 2015).

It is the ALJ's duty to assess all medical opinions and determine the weight to be given these opinions. *See Finch*, 547 F.3d at 936 ("The ALJ is charged with the responsibility of resolving conflicts among medical opinions."); *Estes v. Barnhart*, 275

F.3d 722, 725 (8th Cir. 2002) ("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'") (citing *Bentley v. Shalala*, 52 F.3d 784, 785–87 (8th Cir. 1995)). However, any physician's conclusion regarding a claimant's RFC addresses an issue that is reserved for the ALJ. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ's RFC finding must be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of limitations," but "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 931-31 (8th Cir. 2016). If the ALJ's RFC is within the "zone of choice" permitted by the evidence, the court must affirm. *Culbertson*, 30 F.3d at 939.

Although there is some medical evidence to support exertional limitations, nothing in the record suggests limitations as extensive as Dr. Younger's. Accepting Dr. Younger's diagnosis of fibromyalgia from July 2, 2015, does not end the analysis. Although fibromyalgia may be disabling in certain cases, to determine whether a claimant suffering from fibromyalgia is disabled, the ALJ is required to consider the intensity and persistence of a claimant's fibromyalgia symptoms, and the effect of these symptoms on the claimant's ability to perform tasks expected in a competitive work environment. *Pirtle v. Astrue*, 479 F.3d 931, 935 (8th Cir. 2007) (citing *Garza*, 397 F.3d at 1089); *see also* SSR 12-2P (describing the evaluation of fibromyalgia in the familiar five-step disability determination process). Here, the ALJ considered the reported severity of Landuyt's symptoms with and without treatment, her compliance with medical providers' recommendations, and the longitudinal treatment record to determine whether her symptoms—whether or not they were attributed to fibromyalgia—could reasonably be expected to cause her alleged limitations.

Substantial evidence supports the ALJ's determination that Landuyt's symptoms were mild. Throughout the record, treatment of Landuyt's chronic pain is conservative. In March 2012, her back pain was reported to be "manageable" with Mobic. AR 338. By May 2012, she was taking Tramadol at night and she was referred to physical therapy

to help manage her back pain. AR 335. Between May and July 2012, Landuyt attended physical therapy appointments where she treated her back pain with therapeutic exercise, massage and application of a TENS unit. Physical therapy was effective in reducing her lower back pain. AR 358, 361, 457.

In May 2013, x-ray imaging of Landuyt's spine showed spondylosis with decreased disc height at the L5-S1 level." AR 487. However, Dr. Eck reported that "her pain is not bothering her enough that she wants to pursue more invasive treatments including physical therapy and possibly surgery." *Id*. In July 2013, Dr. Younger noted that Landuyt had switched to Gabapentin and that the Gabapentin had helped with her pain. AR 748. In September 2013, Dr. Younger referred Landuyt back to physical therapy, which she attended two to three times per week for the next four months. AR 505, 598-650, 679-713. Landuyt's treatment at these appointments consisted of ultrasound massage and muscle strengthening exercises, which she was instructed to continue at home. *Id*. Landuyt saw great improvement following physical therapy, reducing her pain level from 8 out of 10 during the first session to 4 or 5 out of 10 for several weeks, and ultimately a consistent 1 or 2 out of 10 upon discharge. *Id*.

Five months later, in March 2014, Landuyt returned to Dr. Younger with muscle pain around her chest and ribs. AR 742. Landuyt did not return for treatment of her back pain until September 2014, when she reported generalized muscle pain and fatigue. AR 740. Dr. Younger prescribed Nortriptyline and one month later Landuyt stated that her pain had improved, and that she recovered more quickly following activity. AR 736. In July of 2015, Landuyt returned to Dr. Younger after a nine month gap in treatment. AR 730. She described her symptoms as "breakthrough" and Dr. Younger suggested discontinuing some of her pain medications and starting on Lyrica. AR 730-31.

Later, following the fibromyalgia diagnosis, Landuyt's symptoms were still described as "60% improved" with Cymbalta (AR 755), "under better control" (AR 766), and "under good control with medication" (AR 774). Further, after the fibromyalgia diagnosis, Dr. Younger consistently stressed the importance of exercise to

14

treat her pain. The fact that the treatment records show consistently mild symptoms, which are treated conservatively, is a good reason to discount the extreme (and therefore inconsistent) limitations opined by Dr. Younger. *Martise*, 641 F.3d at 924 (conditions which are "controllable and amenable to treatment . . . 'do not support a finding of disability.'" (quoting *Davidson*, 578 F.3d at 846)); *Casey*, 503 F.3d at 692 (records showing tender points but also normal examinations in other areas, such as range of motion, and recommendations of exercise and a nonsteroidal drug demonstrated inconsistencies).

Beyond the inconsistencies between Dr. Younger's unremarkable treatment records and his disabling RFC opinion, the inconsistent fibromyalgia diagnosis itself is a good reason to discount his opinion. *See Hamilton*, 518 F.3d at 610-11 (poorly documented lupus and fibromyalgia a good reason to give treating physician's opinion less deference). Landuyt was first diagnosed with either moderate or severe osteoarthritis in her lower back. AR 453 (Dr. Anwar: "x-ray that was showing severe arthritis in lumbar and S1 region"); 479 (Dr. Younger reviewing same x-ray: "She's had imaging of her low back which showed moderate osteoarthritis."). In September 2013, Dr. Younger began to consider whether Landuyt's pain was muscular rather than skeletal, and, as discussed above, referred her to physical therapy to address that pain. AR 505. In November 2013, Dr. Younger diagnosed Landuyt with Myofascial Pain Syndrome, a disorder in which pressure on sensitive points in the muscles causes pain in seemingly unrelated body parts. AR 744.

Dr. Younger did not diagnose fibromyalgia until July 2015, the same month he authored his first RFC opinion. AR 714, 727, 730. As the ALJ correctly noted, the medical records at this time do not demonstrate that Dr. Younger conducted formal fibromyalgia tender point testing.[2] AR 17. Given that Dr. Younger attributed the

---

[2] *See* SSR 12-2P. Landuyt's argument to the contrary on this point is misplaced. It is true that the medical record notes "diffuse tenderness" or "tender points" prior to the "formal testing" noted at AR 774. However, the ALJ did not err by requiring formal testing. Tenderness can

15

limitations in his RFC opinion to fibromyalgia, the lack of objective diagnostic criteria and medical evidence as to how fibromyalgia impacted Landuyt's activities of daily living before that time is a good reason to discount Dr. Younger's opinion. *Hamilton*, 518 F.3d at 610-11. Although the records and second RFC opinion submitted to the Appeals Council confirm the formal diagnosis of fibromyalgia, they do not supply an explanation for Dr. Younger's extensive limitations.

Finally, Landuyt's reported activities of daily living and lack of exertional limitations are both good reasons to discount Dr. Younger's RFC opinion. Although a claimant need not prove that he or she is bedridden to be found disabled, *Payton v. Shalala*, 25 F.3d 684, 687 n.6 (8th Cir. 1994), both Landuyt's testimony and the forms she completed in connection with her application for disability benefits are consistent with the ALJ's RFC determination. *See* AR 42, 64-69, 71-73, 229-31 (Landuyt can cook, perform household chores, garden, use her computer, crochet, attend church weekly, drive up to an hour, and shop in a store for up to two hours at a time). Although these activities on their own might not necessarily be equivalent to full-time competitive employment, the fact that Dr. Younger frequently observed "normal functioning" and "no exertional symptoms" supports the ALJ's RFC. *See* AR 511, 453, 743; *see also* AR 506, 511, 726, 732, 737, 740, 745, 747, 755, 763, 767 (generally normal physical examinations, aside from pain).

In short, despite discounting some of Dr. Younger's opinions and not having access to the later, formal diagnosis of fibromyalgia, the ALJ's RFC is supported by substantial medical evidence. The ALJ did not discount the fact that Landuyt experiences pain upon activity. AR 16. However, considering the manageability of Landuyt's symptoms, Landuyt's reported daily activities, and the medical record as a whole, ALJ's

---

have multiple causes, as noted in SSR 12-2P, and it was not error for the ALJ to follow the regulations rather than guessing as to what the references to tender points may mean.

RFC finding is clearly within the "zone of choice" permitted by the evidence. *Culbertson*, 30 F.3d at 939. Landuyt's objection is overruled.

### B. *Failure to Order a Consultative Examination*

Next, Landuyt argues that it was error for the ALJ to fail to order a consultative report. Landuyt contends that if the ALJ did not believe she had been diagnosed with fibromyalgia, the ALJ should have complied with the request to obtain a confirming diagnosis from a consulting examiner. As a result, Landuyt contends, the ALJ failed to fully develop the record, resulting in an RFC that is not supported by substantial evidence.

The Eighth Circuit has previously addressed the ALJ's duty to develop the record:

> "A disability claimant is entitled to a full and fair hearing under the Social Security Act." *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir.2010) (internal quotations and citation omitted). Where "the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," the claimant has received a "full and fair hearing." *Id.* (internal quotations and citation omitted). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Id.* (internal quotations and citation omitted).
>
> > While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo [v. Barnhart]*, 377 F.3d [801,] 806 [(8th Cir.2004)]. The Commissioner's regulations explain that contacting a treating physician is necessary only if the doctor's records are "inadequate for us to determine whether [the claimant is] disabled" such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and

17

>laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e), 416.912(e).

*Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) (modifications supplied; quoting *Goff*, 421 F.3d at 791).

Landuyt's argument turns on "whether a crucial issue" in this case is underdeveloped. The ALJ's duty is triggered when there is insufficient medical evidence to determine the claimant's RFC. However, there was sufficient medical evidence in the present case—the ALJ was fully informed as to Landuyt's pain and symptoms and was able to determine Landuyt's RFC from Landuyt's own testimony and reported daily activities, as well as the reports of the consultative examiners. Even if the ALJ had requested a consulting examiner to confirm the diagnosis of fibromyalgia, that additional information would not have changed the outcome given the other evidence in the record that supports the ALJ's RFC. *See Martise*, 641 F.3d at 926-27 (rejecting argument that the ALJ should have ordered a consultative examination when the ALJ considered the medical evidence and made factual findings about the evidence that were supported by substantial evidence). Landuyt's objection is overruled.

## V. CONCLUSION

For the reasons set forth herein:

1. Plaintiff Kari L. Landuyt's objections (Doc. No. 17) to the Report and Recommendation (Doc. No. 16) are **overruled**.

2. **I accept** United States Magistrate Judge Kelly K.E. Mahoney's Report and Recommendation without modification. *See* 28 U.S.C. § 636(b)(1).

3. Pursuant to Judge Mahoney's recommendation:

   a. The Commissioner's determination that Landuyt was not disabled is **affirmed**; and

   b. Judgment shall enter against Landuyt and in favor of the Commissioner.

**IT IS SO ORDERED.**

**DATED** this 28th day of March, 2018.

_____
Leonard T. Strand, Chief Judge